COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judge Friedman and Senior Judge Clements
Argued at Richmond, Virginia

UNPUBLISHED

JAVON MARTAY PEGRAM

MEMORANDUM OPINION[*] BY
v.      Record No. 0207-24-2      CHIEF JUDGE MARLA GRAFF DECKER
                                  AUGUST 19, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Claire G. Cardwell, Judge

Paul C. Galanides for appellant.

Ryan Beehler, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Javon Martay Pegram appeals his convictions of attempted first-degree murder,

aggravated malicious wounding, malicious wounding, maliciously shooting at a vehicle,

discharging a firearm from a vehicle, and two counts of first-degree murder. *See* Code

§§ 18.2-26, -32, -51, -51.2, -154, -286.1. Pegram argues that the trial court erred by not

instructing the jury about the danger of relying on uncorroborated accomplice testimony. He

also challenges the sufficiency of the evidence to support his conviction for aggravated malicious

wounding based on the possibility that the victim of that crime was wounded by crossfire from

someone other than him or a co-defendant. For the following reasons, we affirm the convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

This case stems from shootings in a parking lot that ended in the deaths of two innocent bystanders and the wounding of two others. Pegram, Kalah Mangram, and Zayon Everett were charged with the shootings and a number of related offenses. They were tried together as co-defendants.[2]

Around 7:30 p.m. on November 12, 2021, a car drove by the OMG Convenience Store at the edge of a neighborhood in the City of Richmond known as Creighton Court. The occupants of the car began shooting into the parking lot, striking four individuals. Two of the victims died, one of whom was 9 years old and the other of whom was 14. Jacquawn Coe and Trevel Davis were also struck by bullets but survived. Immediately after the attack at the convenience store, gunfire struck the car of Alexia Brooks as she drove nearby with her two children in the car. After firing a barrage of bullets, the assailants fled.

In the early morning hours following the shootings, around 2:00 a.m. on November 13, 2021, Officer Richard Szymanski of the City of Richmond Police Department stopped a car for driving with its headlights off. Pegram was in the car with Mangram, and Szymanski took their photographs.

Several law enforcement officers from the City of Richmond Police Department investigated the shootings involving the convenience store and Brooks's car. Officer Bryan

---

[1] On review of the sufficiency of the evidence supporting a conviction, the Court views the evidence in the light most favorable to the Commonwealth. *See Hargrove v. Commonwealth*, 77 Va. App. 482, 491 n.1 (2023). However, in reviewing a trial court's ruling on a proposed jury instruction, the evidence is viewed in the light most favorable to the instruction's proponent, in this case Pegram. *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021). Accordingly, this opinion sets out all of the evidence relevant to the issues before the Court.

[2] Mangram and Everett were also convicted and appealed their convictions. *See Mangram v. Commonwealth*, No. 0597-24-2 (Va. Ct. App. Aug. 19, 2025), and *Everett v. Commonwealth*, No. 1508-24-2 (Va. Ct. App. Aug. 19, 2025), both decided this day.

Marceau found the car used by the assailants abandoned in a parking lot in Mosby Court, a nearby area in the City of Richmond. A bullet hole was found in the roof of the car. Forensic analysis identified DNA from Clintoine Baker in the vehicle. Baker was arrested, and he later identified Pegram, Mangram, and Everett as his accomplices in the shootings. An AR-15-style rifle was recovered from Mangram's brother that was subsequently connected to the shootings through forensic analysis. During the investigation, law enforcement collected cartridge cases, bullets, and bullet fragments from the area, from the bodies of the victims, and from the two cars involved.

At the jury trial, eyewitnesses and surviving victims testified, but they could not identify the shooters. The Commonwealth's primary evidence identifying the three defendants as the offenders came from Baker. He testified that on November 12, 2021, he, Pegram, Mangram, and Everett left their neighborhood, Mosby Court, intending to find and shoot residents of the rival neighborhood of Creighton Court. He explained that their motivation was simply animosity between the neighborhoods and they did not have any particular individuals in mind. According to Baker, Pegram drove the four of them in a stolen car. They circled the OMG Convenience Store until they spied people leaving the store whom they considered suitable targets. Baker testified that although he and his accomplices opened fire, it was possible that someone on "the street" shot at them and may have fired first. Baker identified the firearms the group used as a 9mm Glock, a .357 or .40, an "AR," and an "AK."

Baker described the parking lot in which they left the stolen car after the shootings. He explained that he attempted to quickly clean the car to remove any evidence that would identify him or his accomplices. Baker also explained that they returned to the area where they had started their evening and briefly went into an apartment. According to him, although he kept his gun, Mangram took the other guns to give to "his people." Baker acknowledged that he had

- 3 -

been charged with the same offenses as Pegram, Mangram, and Everett. Detective Ja'Ontay Wilson testified that he knew the co-defendants from Mosby Court and that the co-defendants and Baker often spent time together.

Other Commonwealth's evidence included a compilation of video surveillance recordings depicting the assailants' route before and after the shootings. The video compilation showed the assailants drive away after the offenses, park, and get out of the car. It then showed their walking path to an apartment building and their movements through a stairwell and into an apartment. During Baker's testimony, he identified himself and the three defendants in the videos. In addition, the compilation included surveillance footage of the parking lot of the convenience store. But not all of the shootings were captured on the recordings due to the placement of the cameras.

Firearms expert Megan Korneke testified about the ballistics evidence, concluding that six firearms were involved in the shootings. Ballistics evidence established that five of the guns were used by the four assailants.[3] One of the firearms connected to the stolen car was determined to have fired a bullet recovered from the chest of one of the deceased victims. Ballistics evidence tied a second firearm connected to the car to bullets that struck two other victims, killing one of them. The bullet fragment recovered from Davis, however, was unsuitable for comparison to any of the other ballistics evidence.

After the Commonwealth presented its case-in-chief, Pegram opted not to present any evidence. He asked the trial court to strike the charges. Defense counsel challenged the sufficiency of the evidence supporting a finding of a permanent injury to Coe. Counsel also argued that the Commonwealth failed to prove that he or any of his companions fired the shots that wounded Davis because the evidence permitted a finding that Davis could have been shot by

_____

[3] Of these firearms, Baker identified four.

- 4 -

return crossfire. The court granted the motion to strike in part, reducing the charge of aggravated malicious wounding of Coe to malicious wounding. It denied the motion as to the other charges.

Before jury deliberations began, defense counsel asked the trial court to instruct the jury on the risks of relying on the uncorroborated testimony of an accomplice. The Commonwealth's attorney countered that the instruction was inappropriate because Baker's testimony was corroborated. The court refused the instruction.

After deliberations, the jury returned guilty verdicts on each of the charges: attempted first-degree murder, aggravated malicious wounding, malicious wounding, maliciously shooting at a vehicle, discharging a firearm from a vehicle, and two counts of first-degree murder. Pegram was sentenced to 135 years in prison, with 88 years suspended.

ANALYSIS

I. Jury Instruction

Pegram argues that the trial court erred by refusing to instruct the jury on the danger of relying on uncorroborated accomplice testimony. His proffered instruction would have told the jury it could base its verdict on Baker's "uncorroborated testimony" but warned about the risk of doing so. *See* Va. Model Jury Instrs.—Crim. No. 3.400.

It is well established that "[w]hen reviewing a trial court's refusal to give a proffered jury instruction," the appellate court "view[s] the evidence in the light most favorable" to the instruction's proponent, in this case Pegram. *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)); *see Barnes v. Commonwealth*, 81 Va. App. 737, 746 (2024). Whether to grant or deny a proffered instruction is reviewed for an abuse of discretion. *Commonwealth v. Richard*, 300 Va. 382, 389 (2021). Underpinning this review is a "bell-shaped curve of reasonability," which "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie."

- 5 -

*Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). "An abuse of discretion occurs only when 'reasonable jurists' could not disagree as to the proper decision." *Warren v. Commonwealth*, 76 Va. App. 788, 799 (2023) (quoting *Thomas v. Commonwealth*, 62 Va. App. 104, 111 (2013)), *aff'd per curiam*, 303 Va. 60 (2024).

Stated simply, a "reviewing court must determine whether 'the law has been clearly stated and . . . the instructions cover all issues [that] the evidence fairly raises.'" *Barnes*, 81 Va. App. at 746 (second alteration in original) (quoting *Holmes v. Commonwealth*, 76 Va. App. 34, 52 (2022)). After all, "[t]he purpose of any jury instruction is to inform the jury of the law guiding their deliberations and verdict." *Holloman v. Commonwealth*, 65 Va. App. 147, 174 (2015) (quoting *Morgan v. Commonwealth*, 50 Va. App. 120, 132 (2007)).

Although "[a] jury may convict a defendant based solely on accomplice testimony," a "trial court must 'warn the jury against the danger of convicting upon such . . . testimony'" if it is uncorroborated. *Barnes*, 81 Va. App. at 746 (quoting *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976)). In contrast, if the accomplice testimony is corroborated, it is appropriate for the trial court to refuse to give such a cautionary instruction. *See Holmes*, 76 Va. App. at 55. "The burden is on the proponent of an instruction 'to satisfy the trial court that the proposed language is . . . applicable to the facts of the case on trial.'" *Holloman*, 65 Va. App. at 174 (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)). And "[w]hether sufficient corroboration exists is 'a question of law' for the trial court, one that we review de novo on appeal." *Barnes*, 81 Va. App. at 746 (quoting *Holmes*, 76 Va. App. at 55).

So the question here is whether Baker's account was corroborated such that the cautionary instruction was not necessary. To corroborate the accomplice's testimony, the evidence "need not be sufficient either to support a conviction or to establish all the essential elements of an offense." *Id.* at 747 (quoting *Dillard*, 216 Va. at 823). When other evidence

corroborates "material facts [that] tend to connect the accused with the crime," a cautionary instruction may be refused. *See id.* (alteration in original) (quoting *Dillard*, 216 Va. at 823). For evidence to sufficiently corroborate accomplice testimony, it must "connect[] the defendant to the crime and corroborate[] the defendant's 'occasion and opportunity for the crime'" and be "sufficient to warrant the jury in crediting the truth of the accomplice's testimony." *Id.* (first quoting *Holmes*, 76 Va. App. at 57; and then quoting *Smith v. Commonwealth*, 218 Va. 455, 457 (1977) (per curiam)).

Here, the trial court listed the evidence it considered corroborative of Baker's testimony identifying the defendants as his accomplices. That evidence included the testimony about the general animosity between the residents of the co-defendants' neighborhood and the neighborhood where the shootings occurred. The court further determined that the fact that one of the guns used in the shootings was found in the possession of Mangram's brother corroborated Baker's testimony that Mangram took most of the guns after the offenses occurred. Importantly, the trial court also noted the visible faces of the assailants who were together in the video-recording compilation.

On appeal, Pegram does not dispute Baker's testimony that Baker committed the offenses with three accomplices. He agrees that the evidence generally corroborates Baker's account of the crimes. This evidence includes testimony about the rivalry between the two neighborhoods, ballistics evidence, the AR-15 used in the shootings that was later found in the possession of Mangram's brother, and the video footage showing the shootings unfold as Baker described. *See generally Barnes*, 81 Va. App. at 750-51 (listing as corroboration evidence that substantiated the accomplice testimony generally rather than only the evidence specifically tying Barnes to the murder).

Pegram's argument narrowly challenges the existence of evidence specifically corroborating Baker's testimony identifying him as one of Baker's accomplices. The record, however, refutes this claim. The video compilation shows the assailants' route after the shootings. After parking the stolen car used in the attack, four males emerged. One of those individuals wore a jacket with a fur-trimmed hood. The video recording shows the assailants as they walked from the car to an apartment building. Video from the apartment stairwell clearly shows the face of the person with Baker whom he identified as Pegram—wearing a jacket with a fur-trimmed hood. Other evidence that corroborated Baker's testimony that Pegram and Mangrum were with him on the night of the shootings was Officer Szymanski's testimony that places Pegram and Mangrum together only hours after the shootings. And in the photograph of Pegram taken during the traffic stop, he was wearing a jacket of the same fur-trimmed style hood as the jacket worn by the person Baker identified as Pegram in the stairwell video.

Taken together, this evidence connects Pegram to the crimes and clearly shows his "occasion and opportunity" to commit them. *See Barnes*, 81 Va. App. at 747 (quoting *Holmes*, 76 Va. App. at 57). As such, the record "is 'sufficient to warrant the jury in crediting the truth of the accomplice's testimony.'" *Id.* (quoting *Smith*, 218 Va. at 457). A cautionary jury instruction should not be given if the record contains corroborating evidence that "tend[s] to connect the accused [to] the crime[s]." *See id.* (quoting *Dillard*, 216 Va. at 823). That evidence does not need to be ironclad. Nor does it need to involve each element of the offense. *See Allard v. Commonwealth*, 218 Va. 988, 990 (1978). It just needs to "tend to connect" Pegram to the offenses. *See Barnes*, 81 Va. App. at 747 (quoting *Dillard*, 216 Va. at 823).

When viewed under the proper standard in the light most favorable to Pegram, the evidence corroborates Baker's testimony that Pegram participated in the shootings. Therefore,

the trial court did not abuse its discretion by rejecting the cautionary instruction relating to accomplice testimony.

## II. Sufficiency of the Evidence

Pegram raises a very limited challenge to the sufficiency of the evidence. He argues that the evidence was insufficient to support his conviction for the aggravated malicious wounding of Davis because the Commonwealth did not exclude the possibility that Davis was wounded by crossfire during the attack.

Our role in reviewing a sufficiency challenge "is a limited one." *See Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). In this Court's review of the sufficiency of the evidence to support a conviction, we will affirm the decision unless it was plainly wrong or the conviction lacked evidence to support it. *See Hargrove v. Commonwealth*, 77 Va. App. 482, 506-07 (2023). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Hogle v. Commonwealth*, 75 Va. App. 743, 753 (2022) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). In conducting this review, the "appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Barney*, 302 Va. at 97 (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Instead, the "relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

An appellate court evaluating the sufficiency of the evidence "does not distinguish between direct and circumstantial evidence, as the fact finder . . . 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). In fact, "[a] conviction may

- 9 -

rest on circumstantial evidence alone." *Garrick*, 303 Va. at 183. The jury, acting as the fact finder, was responsible for "weigh[ing] the evidence" and "draw[ing] reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). And "[r]easonable inferences drawn by the factfinder 'cannot be upended on appeal unless we deem them so attenuated that they push into the realm of *non sequitur.*'" *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 332 (2018) (per curiam)).

It is through this well-established legal lens that we view the sufficiency challenge. Pegram was convicted of the aggravated malicious wounding of Davis. To obtain a conviction for malicious wounding, in pertinent part, the Commonwealth must prove that the defendant acted with the requisite intent. *See* Code § 18.2-51.2(A). Pegram cites *Rivers v. Commonwealth*, 21 Va. App. 416 (1995), in support of his argument that the Commonwealth failed to prove his intent because it did not establish that he or one of his accomplices actually shot Davis. *See generally Carter v. Commonwealth*, 232 Va. 122, 126 (1986) ("[E]ach co-actor is responsible for the acts of the others . . . ."). But *Rivers* does not control here.

In *Rivers*, 21 Va. App. at 419, the Court reversed a conviction for second-degree murder. During a gunfight between Rivers and his neighbor, the neighbor shot and killed a bystander. *Id.* at 420. The Court emphasized that Rivers did not fire the fatal bullet; instead, it was fired by someone acting in opposition to him. *Id.* at 421-24. Therefore, the Court held that "no existing common law theory," such as concert of action, transferred intent, or felony murder, supported the intent element required to convict Rivers. *Id.* at 421.

Pegram is correct that if Davis was wounded by a bystander or victim who returned fire in opposition to him, the Commonwealth did not present evidence sufficient to support his conviction for aggravated malicious wounding. *See id.* at 419. He hypothesizes that Davis could have been

wounded by victim crossfire and therefore suggests that the Commonwealth did not establish his criminal liability. Pegram points to the fact that the ballistics evidence did not establish what kind of firearm shot Davis. But these facts are in stark contrast to those in *Rivers* and do not support Pegram's conclusion.

Pegram relies on what he characterizes as a reasonable hypothesis of innocence. The law in this area is well-settled. "[W]hen the evidence is wholly circumstantial[,] . . . all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence." *Haas v. Commonwealth*, 299 Va. 465, 468 (2021) (third alteration in original) (quoting *Rogers v. Commonwealth*, 242 Va. 307, 317 (1991)). "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Vasquez v. Commonwealth*, 291 Va. 232, 249-50 (2016) (quoting *Hudson*, 265 Va. at 513). "The question" on appellate review "is not whether there was 'some evidence' to support a defendant's hypothesis of innocence, because the totality of the circumstantial evidence may allow a factfinder to reject an asserted hypothesis of innocence as unreasonable." *Wilkerson*, ___ Va. at ___ (quoting *Moseley*, 293 Va. at 464). "[W]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on [this Court] unless plainly wrong." *Clark v. Commonwealth*, 78 Va. App. 726, 752 (2023) (alterations in original) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023) (en banc)).

Davis was shot after he left the store. He testified that he could not tell where "the shots c[ame] from" and saw no one shooting during the barrage of gunfire. He ran across the intersection and collapsed. Bullets struck him in his lower stomach, shoulder, and hand. The jury could conclude that each of the three bullets caused a life-threatening or permanent injury.

On cross-examination, Baker testified that during the attack he thought one person "from the street" returned fire. Analysis of the ballistics evidence connected only five of the six guns used to Baker and his accomplices. The gun not tied to Baker or the three co-defendants lodged a bullet fragment in the roof of their car. That gun also dropped cartridges in the parking lot outside the OMG Convenience Store. This evidence supports the supposition that someone in the store parking lot shot at Pegram and his accomplices.

Even so, the record supports the jury's factual finding that Baker or one of the three co-defendants shot Davis as he left the store. The group drove to the Creighton Court neighborhood specifically with the intent to shoot people who lived there. They circled the OMG Convenience Store until they saw people they deemed to be suitable targets. The four assailants released a barrage of bullets, and Davis was shot not once but three times as he fled to safety across the street.[4] On this evidence, it was entirely reasonable for the jury to conclude that one of the four assailants fired at least one of the three bullets that struck Davis. Such a conclusion was simply not plainly wrong nor without evidence to support it. *See Garrick*, 303 Va. at 182 ("An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not.").

Ballistics evidence tending to show that someone standing outside the store returned fire toward the assailants' car as it drove by does not undermine this factual finding as a matter of law. The jury had the evidence before it and rejected the possibility that Davis was wounded *solely* by possible crossfire. It resolved the question of fact of whether Pegram's alternative hypothesis of innocence was reasonable. *See Vasquez*, 291 Va. at 250. Significantly different from the facts in

---

[4] Further, the video recording shows the assailants firing on a group of three individuals, one of whom fled across the street. The jury was entitled to view this evidence as proof of Davis's location at the time of the shootings in relation to the assailants' car, the other bystanders, and the cartridges expelled in the parking lot. *See generally Barney*, 302 Va. at 97 (recognizing the appellate court's duty to defer to "the factfinder's 'interpretation of all of the evidence, including video evidence[,]' presented at trial" (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022))).

*Rivers*, 21 Va. App. at 420, the evidence here did not affirmatively establish that all three bullets that struck Davis were fired by someone acting in opposition to the co-defendants. It was reasonable for the jury to reject the hypothesis that someone on the street aiming at the assailants' car accidentally shot a bystander *three times*, particularly one who was running away from the scene. *See Vasquez*, 291 Va. at 250 (explaining that the rejection of a hypothesis of innocence is plainly wrong only when no "rational factfinder could have found that the incriminating evidence render[ed] the hypothesis of innocence unreasonable").

For these reasons, the jury's finding that Pegram or one of his accomplices fired at least one of the three bullets that struck Davis is not plainly wrong or without evidence to support it.

CONCLUSION

The court acted within its discretion by declining to caution the jury on the danger of relying solely on uncorroborated accomplice testimony. Further, the evidence was sufficient to support the jury's finding that Pegram or one of his accomplices fired at least one of the bullets that struck Davis. Consequently, we affirm the convictions.

*Affirmed.*